From:   Ulysses T. Ware

To: The Hon. William H. Pauley, III

Date:   June 28, 2021

RE: Filing the enclosed pleadings on the 04cr1224 and 05cr1115 (SDNY) dockets.

Judge Pauley:

    Please file the enclosed **<u>pleading</u>** and please properly and correctly identify the enclosed as a pleading rather than a "letter":

**(#27) re: Exhibit #16 to June 26, 2021, Supplement #1 to June 11, 2021, Declaration of Ulysses T. Ware Dispositive Material Undisclosed Brady Exculpatory Evidence**:  **SEC Release 33-7190** see n. 17 at page 12:

on the applicable dockets.

    In the future, please serve Mr. Ware via email at <u>utware007@gmail.com</u> with a copy of the Government's filings, as well as all of your orders or directives entered in this matter, due to the slowness of the U.S. Mail.

/s/ Ulysses T. Ware

## Case Nos. 05cr1115 (SDNY) and 04cr1224 (SDNY) (#27)

Submitted on June 28, 2021,  by:

/s/ Ulysses T. Ware

Ulysses T. Ware, individually, and as
the legal representative for the estate
of third-party surety Mary S. Ware.
123 Linden Blvd.
Suite 9-L
Brooklyn, NY 11226
(718) 844-1260 phone
utware007@gmail.com

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

United States of America, et al.,
         Plaintiff, Petitioner,
         Cross Respondent,

         v.

Ulysses T. Ware, et al.,
         Defendant, Respondent,
         And Cross Petitioner.

**(#27) re: Exhibit #16 to June 26, 2021, Supplement #1 to June 11, 2021, Declaration of Ulysses T. Ware Dispositive Material Undisclosed Brady Exculpatory Evidence**:  SEC Release 33-7190 see n. 17 at page 12:

"Accordingly, **any** distributions by a **statutory underwriter** [each of the 02cv2219 (SDNY) plaintiffs] **must be registered pursuant to Section  5.**  *United States v. Wolfson*, 405 F.2d 779, 782 (2d Cir. 1968), cert. denied, 394 U.S. 946 (1969)." See also *Berckeley*, 455 F.3d at 220 (same).

Ergo, as a matter of law, **(i)** the *United States v. Ware*, 04cr1224 (SDNY) indictment's charges failed to charge a criminal contempt **offense**, 18 USC 401(3); ipso facto, **(ii)** the USAO lacked all probable cause to seek an indictment; and **(iii)** the district court (Sweet, J.), lacking an *offense*, lacked all 18 USC 3231 subject matter jurisdiction to enter any judgment of conviction, sentence, fines, or other penalty. **The 02cv2219 and 04cr1224 (SDNY) cases' orders, judgments, and proceedings are moot as a matter of law**.

SECURITIES AND EXCHANGE COMMISSION

17 CFR PART 231

**RELEASE NO. 33-7190 INTERNATIONAL SERIES NO. 821 FILE NO. S7-20-95 PROBLEMATIC PRACTICES UNDER REGULATION S**

AGENCY:   Securities and Exchange Commission

ACTION:   Interpretive Release; Request for Comments

SUMMARY:  The Commission is publishing its views concerning problematic practices under Regulation S and is requesting comment as to whether Regulation S should be amended to limit its vulnerability to abuse. The Commission will study the comments received in response to this release and will determine whether rulemaking or other action is necessary or appropriate.

DATES:  This interpretation is effective [upon publication in the Federal Register]. Comments should be received on or before September 8, 1995.

ADDRESSES:  Comment letters should refer to File number S7-20-95 and should be submitted in triplicate to Jonathan G. Katz, Secretary, U.S. Securities and Exchange Commission, 450 Fifth Street, N.W., Washington, D.C. 20549.  The Commission will make all comments available for public inspection and copying in its Public Reference Room at the same address.

FOR FURTHER INFORMATION CONTACT:  Paul Dudek or Annemarie Tierney, (202) 942-2990, Office of International Corporate Finance, Division of Corporation Finance, U.S. Securities and Exchange Commission, Washington, D.C. 20549.

SUPPLEMENTAL INFORMATION:   The Commission is stating its views with respect to certain problematic practices in connection with offers and sales under Regulation S, -[1]- the safe harbor under the Securities Act of 1933 (the "Securities Act")-[2]- for offshore offerings or resales, and is requesting comment as to whether specific amendments to Regulation S are necessary to curtail Regulation S abuses.
    In addition, in a companion release, -[3]- the Commission is publishing for comment rule revisions that would eliminate certain impediments to registered offerings of securities under the Securities Act by streamlining requirements with respect to financial statements of significant acquisitions.  Also in the companion release, rule revisions are proposed that would require registrants to report on a quarterly basis recent sales of equity securities that have not been registered under the Securities Act.

I.   INTRODUCTION
    The Commission adopted Regulation S in April 1990 in order

SEC Release 33-7190
Exhibit #16 June 26, 2021, Supplement #1 to June 11, 2021, Declaration.
Dispositive Undisclosed Brady exculpatory evidence.

to clarify the extraterritorial application of the registration

-------- FOOTNOTES --------

-[1]-      17 CFR 230.901-904.

-[2]-      15 U.S.C. 77a et seq.

-[3]-      Securities Act Release No. 7189.

-------------------- BEGINNING OF PAGE #2 --------------------

requirements of the Securities Act.-[4]-  Since adoption, a
number of problematic practices have developed involving
unregistered sales of equity securities of domestic reporting
companies purportedly in reliance upon Regulation S.  In this
release, the Commission states its views concerning these
problematic practices and is requesting comment as to whether
Regulation S also should be amended to impose additional
restrictions on its use to impede attempts to use the Regulation
to evade the registration requirements of the Securities Act.
     Commenters have suggested that companies may be compelled to
sell securities offshore, rather than in registered transactions,
because of the registration disclosure requirements relating to
significant acquisitions.  In a companion release, the Commission
is proposing to streamline these requirements to reduce
regulatory impediments to the use of registered offerings.  Also,
in response to commenters' suggestions that investors need
information about private or offshore placements of equity
securities that is not currently required to be disclosed, the
Commission is proposing to require quarterly reporting of
unregistered equity offerings.  Commenters have suggested this
public reporting may also have the ancillary benefit of deterring
abuses of Regulation S.  The Commission in this release is
soliciting comment as to other regulatory burdens that may cause
issuers to resort to offshore offerings rather than registered
public offerings.

II.   INTERPRETIVE GUIDANCE ON REGULATION S PRACTICES
        Regulation S contains a general statement providing that
Section 5 of the Securities Act -[5]- shall be deemed not to
apply to offers or sales of securities that occur outside the
United States-[6]- and two non-exclusive safe harbors.-[7]-
However, neither of the safe harbors nor the general statement is
available for a transaction or series of transactions that,
although in technical compliance with the regulation, is part of
a plan or scheme to evade the registration requirements of the
Securities Act.-[8]-
     Preliminary Note 2 to Regulation S states that "...
Regulation S is not available with respect to any transaction or
series of transactions that, although in technical compliance
with these rules, is part of a plan or scheme to evade the
registration provisions of the Act.  In such cases, registration
under the Act is required."  This release pertains only to
violations of Section 5 in connection with Regulation S offerings

and does not address issues dealing with the antifraud provisions of the federal securities laws.

The safe harbors provide specific guidance to issuers and other market participants as to conditions under which a transaction will be deemed to occur outside the United States.

-------- FOOTNOTES --------

-[4]-      Securities Act Release No. 6863 (April 24, 1990) [55 FR 18306] (the "Adopting Release").

-[5]-      15 U.S.C. 77(e).

-[6]-      See Rule 901.  Whether a transaction occurs outside the United States within the meaning of Rule 901 is a question of the facts and circumstances of the transaction.  See the Adopting Release at footnote 18 and accompanying text.

-[7]-      See Rules 903 and 904.

-[8]-      See Preliminary Note 2 to Regulation S.

-------------------- BEGINNING OF PAGE #3 --------------------

One safe harbor applies to offers and sales by issuers, underwriters and other persons involved in the distribution process pursuant to contract (defined as "distributors") and any person acting on behalf of the foregoing (the "issuer safe harbor").-[9]-  The other safe harbor applies to resales by persons other than the issuer, distributors, their respective affiliates (except certain officers and directors) and persons acting on behalf of the foregoing (the "resale safe harbor").-[10]-  An offer and sale of securities that satisfies all conditions of the applicable safe harbor is deemed to be outside the United States and thus is not subject to the registration requirements of Section 5, provided that it is not part of a plan or scheme to evade registration.-[11]-

Since the adoption of Regulation S, it has come to the Commission's attention that some market participants are conducting placements of securities purportedly offshore under Regulation S under circumstances that indicate that such securities are in essence being placed offshore temporarily to evade registration requirements with the result that the incidence of ownership of the securities never leaves the U.S. market, or that a substantial portion of the economic risk relating thereto is left in or is returned to the U.S. market during the restricted period, or that the transaction is such that there was no reasonable expectation that the securities could be viewed as actually coming to rest abroad.  These transactions are the types of activities that run afoul of Preliminary Note 2, would not be covered by the safe harbors and would be found not to be an offer and sale outside the United States for purposes of the general statement under Rule 901.-[12]-

-------- FOOTNOTES --------

-[9]-    See Rule  903.   The issuer  safe harbor  distinguishes
         three  categories of  securities offerings,  based upon
         factors such as the nationality and reporting status of
         the issuer  and the degree  of U.S. market  interest in
         the issuer's securities.  Under the issuer safe harbor,
         varying  procedural  safeguards  are  imposed with  the
         intent of having  the securities  offered come to  rest
         offshore.

-[10]-   See Rule 904.

-[11]-   Section 5 of  the Securities Act prohibits  any person,
         directly or indirectly, from using instrumentalities of
         interstate commerce  or the  mails to  offer or  sell a
         security unless a registration statement has been filed
         or is in effect  as to such security.  Exemptions from
         the registration provisions are set forth in Sections 3
         and 4 of the statute, and the related rules promulgated
         under the Securities Act.  A person who offers or sells
         a  security  in  reliance  upon  an  exemption  from the
         registration requirements of  Section 5 has the  burden
         of establishing  the  availability  of  the  exemption.
         Securities  & Exchange Commission  v. Murphy,  626 F.2d
         633,  645  (9th  Cir.  1980).    Such  exemptions  are
         construed narrowly.  Id. at 641.

-[12]-   In addition,  a purported  Regulation  S offering  that
         involves a distribution in the  United States may raise
         issues under Rule 10b-6  under the Securities  Exchange
         Act  of 1934.  See, e.g., R.A.  Holman & Co.,  Inc. v.
         Securities  & Exchange  Commission, 366  F.2d 446,  at
                                               (continued...)

-------------------- BEGINNING OF PAGE #4 --------------------

    The practices described below generally have involved equity
securities of U.S. companies whose securities are traded
principally, and typically solely, in the United States.
    There have been a variety of schemes involving parking
securities with offshore affiliates of the issuer or a
distributor.  In these transactions, Regulation S is claimed as
the basis to sell securities to offshore shell entities formed by
the issuer or a distributor (or, in some cases, persons closely
associated with the issuer or distributor) to purchase the
securities.  The entities hold the securities for the restricted
period; at the end of that period, proceeds from the U.S. sale
make their way, directly or indirectly, to the issuer or
distributor.  These transactions do not qualify for either the
Regulation S safe harbor or the Rule 901 general statement since
they are nothing more than sham offshore transactions structured
to evade the Securities Act registration requirements.
    Troubling issues also have arisen under the resale safe

harbor provisions of Rule 904.  Rule 904 cannot be used for the
purpose of "washing off" resale restrictions, such as the holding
period requirement for restricted securities in Rule 144.-[13]-
Likewise, the restricted status of securities is not affected by
a prearranged transaction by or on behalf of the seller conducted
offshore.  If a person with restricted securities sold the
securities in an offshore transaction and replaced them with a
repurchase of fungible unrestricted securities, the replacement
securities would be subject to the same restrictions as those
replaced.

       As noted, the Commission has become aware of a number of
instances where the total mix of factors raises the concerns
described above.  These factors, any one of which may serve to
indicate that the economic or investment risk never shifted to
the offshore purchaser, and that the securities -- as a matter of
substance as opposed to form -- never left the United States or
remained offshore for less than the restricted period, have
included the use of:  (i)  non-recourse promissory notes (notes
where the purchaser never is at risk in connection with the
purchase of the securities) for all or almost all of the purchase
price, where the expectation of repayment stems from the resale
of the securities into the U.S. market, (ii) recourse notes where
the entity providing the notes is unknown to the seller of the
securities or the entity has no, or minimal, assets where, again,
the expectation of repayment stems from the resale of
securities into the U.S. market, (iii) fees paid to the purchaser
of the securities to hold the securities for the restricted
period, whether paid directly or as more frequently seems to be
done through significant-[14]- discounts to the U.S. market price

-------- FOOTNOTES --------

-[12]-(...continued)
          449, (2d Cir. 1966) (a  distribution of securities  is
          not deemed to be completed until the securities come to
          rest in the hands of the investing public).

-[13]-    See Rule 144(d).

-[14]-    Of  course,  some discounts  may  well be  warranted in
          order to compensate  for the  length of the  restricted
          period, historic volatility  of  the stock,  financial
          condition  of the  issuer, the dilution  represented by
          the newly  issued shares,  current  market  condition,
          availability of current information  as to the  issuer,
          information the issuer may have  had that was disclosed
          to the  purchaser but  not otherwise  disclosed to  the
                                                    (continued...)

-------------------- BEGINNING OF PAGE #5 --------------------

for the issuer's stock, where the fees or discounts are such to
indicate that the transaction was intended to create a parking
scheme or other scheme where the securities were merely being
held offshore to evade the registration requirements, and (iv)

short selling and other hedging transactions such as option
writing, equity swaps or other types of derivative
transactions,-[15]- where purchasers transfer the benefits and
burdens of ownership back to the United States market during the
restricted period.-[16]-

In these cases it appears the transaction is nothing more
than a delayed sale by the seller in the United States, with the
purported offshore purchaser serving as a statutory
underwriter.-[17]-

-------- FOOTNOTES --------

-[14]-(...continued)
market, or other factors. Nevertheless, some discounts
have been so unrelated to the economics of the
transaction that the only justification that can be
ascertained is that they are part of a parking or
holding scheme where the offshore purchaser is simply
being used as a conduit for what is in reality an
onshore financing.

-[15]-    See Securities Act Release No. 7187, Part II.A, which
addresses equity swaps and other like investment
strategies in different contexts.

Securities would not be deemed to have come to rest abroad
during the restricted period if the securities were pledged
as collateral, either in a margin account or otherwise,
where the expectation was that the collateralization would
shift the benefits and burdens of ownership to the lender as
opposed to the purchaser and the lender was not offshore.

-[16]-    Since the market for the securities is in the United
States, the short-selling or other hedging transaction
occurs in the United States markets. If the short-
selling or other hedging transaction occurred solely by
or among parties offshore, and the purchaser engaged in
the transaction could reasonably expect that the
economic risk of ownership would remain abroad, then
the transaction could satisfy the requirements of the
rule if the other provisions of Regulation S were
satisfied.

-[17]-    Public resales in the United States by persons that
would be deemed underwriters under Section 2(11) of the
Securities Act [15 U.S.C. 77b(11)] would not be
permissible without registration or an exemption from
registration. Footnote 110 of the Adopting Release,
which addresses the restricted periods, should not be
read to provide otherwise.

Section 4(1) of the Securities Act [15 U.S.C. 77d(1)]

exempts "transactions by any person other than an issuer, underwriter, or dealer." Section 2(11) defines the term "underwriter" as:

>          any person who has purchased from an issuer with a view
>                                                  (continued...)

-------------------- BEGINNING OF PAGE #6 --------------------


III. REQUEST FOR COMMENTS
     In addition to taking enforcement action against those who seek to evade the registration requirements of the Securities Act under the color of compliance with Regulation S,-[18]- the Commission is considering whether it is necessary to amend the regulation to deter these abuses and requests comment as to the need for revision of Regulation S. A number of proposed revisions have been suggested by commentators.-[19]- These suggestions are being considered by the Commission and comment is requested on each of the proposals that follow. Commentators' proposals have generally focused on common stock placements by domestic issuers. Is there a comparable need for such restrictions in the case of foreign issuers' equity for which the United States is the sole or principal market, or for any other class of securities?

     1.   Extend the Restricted Period. Currently, the restricted period under the category 2 safe harbor-[20]- for offerings of securities of domestic companies that are reporting under the Securities Exchange Act of 1934 (the "Exchange Act")-[21]- is 40 days. Some have suggested extending the restricted period, for example, to one year in the case of equity securities of domestic issuers. One commentator has suggested that such offerings should be subject to the more restrictive conditions of the category 3 safe harbor,-[22]- which are currently generally applicable to offshore offerings by non-reporting domestic issuers. This would not only extend the restricted period to one year but also require legending of share

-------- FOOTNOTES --------

-[17]-(...continued)
          to, or offers or sells for an issuer in connection
          with, the distribution of any security, or participates
          or has a direct or indirect participation in any such
          undertaking .... As used in this paragraph the term
          "issuer" shall include, in addition to an issuer, any
          person directly or indirectly controlling or controlled
          by the issuer, or any person under direct or indirect
          common control with the issuer.

          Accordingly, any distributions by a statutory "underwriter"
          must be registered pursuant to Section 5. United States v.
          Wolfson, 405 F.2d 779, 782 (2d Cir. 1968), cert. denied, 394
          U.S. 946 (1969).

-[18]-    See, for example, United States v. Sung and Feher,
          Litigation Release No. 14500 (May 15, 1995); Securities
          and Exchange Commission v. Softpoint, Inc., et al.,
          Litigation Release No. 14480 (April 27, 1995).

-[19]-    See Ajhar, "Foreign Stock Sales: Don't Get
          Blindsided," Worth p. 37 (March 1994); The Corporate
          Counsel, March-April 1995; E. Greene, "Recent Problems
          Under Regulation S," Insights (August 1994); "Rule
          Permitting Offshore Stock Sales Yields Deals that Spark
          SEC Concerns", Wall Street Journal, at C1, April 26,
          1994.

-[20]-    Rule 903(c)(2).

-[21]-    15 U.S.C. 78a et seq.

-[22]-    Rule 903(c)(3).

-------------------- BEGINNING OF PAGE #7 --------------------

certificates and an express agreement by the purchaser to resell
the securities only in accordance with an available exemption
from registration.

     2.   Exclude certain discounted offers from the safe harbor.

Another possible revision would be to limit use of the category 2
safe harbor by domestic issuers offering common stock to those
offerings sold at the market price or with a specified minimal
discount.  Those selling at a disqualifying discount could
proceed under Rule 901 if the facts and circumstances established
that the placement was truly an offshore offer and sale and not
part of a plan or scheme to evade the registration requirements
of the Securities Act.  Alternatively, rather than exclude some
or all discounted offerings from the issuer safe harbors, should
instead a longer restricted period or all of the category 3
procedures apply to discounted offers?

     3.   Restrict risk shifting transactions during the
restricted period.
     Should the safe harbor require selling restrictions that
limit purchasers' ability during the restricted period to sell
short or otherwise take a short position with respect to, or
otherwise hedge the risk of holding common equity securities?

     4.   Prohibit payment with certain types of non-recourse or
other types of promissory notes where the expectation of
repayment derives solely from the resale of securities.  Should
the category 2 or 3 safe harbor be amended to prohibit (or limit
through tolling of the restricted period) payment for common
equity securities with certain types of non-recourse or other
types of promissory notes where the expectation of repayment
derives solely (or primarily) from the proceeds of resale of the

SEC Release 33-7190
Exhibit #16 June 26, 2021, Supplement #1 to June 11, 2021, Declaration.
Dispositive Undisclosed Brady exculpatory evidence.

securities?

IV.  THE ROLE OF REGULATION S IN COMPANIES' CAPITAL RAISING PLANS
     The Commission, when it adopted Regulation S, understood and
intended that legitimate offshore transactions whereby the issuer
intended that its securities would be sold and placed offshore
would be covered by Regulation S.  Regulation S clarified and
simplified procedures for offshore placement of securities and
was intended to provide U.S. issuers with an efficient capital
raising alternative.  The Commission understands, in part due to
its participation in the Government-Business Forum on Small
Business Capital Formation, that there are issuers, particularly
those ineligible to use shelf registration, that view offshore
offerings as an important financing alternative.  The Commission
is soliciting comments as to the types of companies that are
using Regulation S, how are they using it, and what mechanisms
can be used to prevent abuse without unduly deterring legitimate
offshore capital raising activities.
     Reportedly, many small business issuers consider Regulation
S offerings an important financing tool.  Is this due to the
increased pool of potential investors, or to the process involved
in accomplishing a Regulation S offering versus a registered
offering, or both?  The Commission also recognizes that issuers
may be compelled to sell securities offshore, rather than in
registered transactions, because of registration disclosure
requirements relating to significant acquisitions.  As noted
above, in a companion release, the Commission is addressing this
concern through rule proposals to streamline these disclosure
requirements.  The Commission is seeking comments as to what
other impediments in the current system may lead to problematic
Regulation S offerings, and what commenters suggest should be
done to alleviate these problems so that resorting to problematic

-------------------- BEGINNING OF PAGE #8 --------------------

Regulation S practices can be eliminated.-[23]-
     Further, the Commission requests that commenters address the
benefits and costs and other burdens to investors, issuers, and
other market participants that would result from any of the
suggested changes to Regulation S noted in Section III above.

V.   COST-BENEFIT ANALYSIS
     The Commission requests views and data relating to the costs
and benefits associated with the proposals relating to additional
restrictions for offerings under Regulation S.  It is expected
that such restrictions would not directly impose additional
burdens on companies, although there may be indirect costs
incurred by companies.

VI.  REQUEST FOR COMMENTS
     Any interested person wishing to submit written comments on
any aspect of the amendments to forms and rules that are subject
to this release are requested to do so.  Comments should be
submitted in triplicate to Jonathan G. Katz, Secretary, U.S.
Securities and Exchange Commission, 450 5th Street, N.W.,

**SEC Release 33-7190**
**Exhibit #16 June 26, 2021, Supplement #1 to June 11, 2021, Declaration.**
**Dispositive Undisclosed Brady exculpatory evidence.**

Washington, D.C. 20549 and should refer to file number S7-20-95.
List of Subjects in 17 CFR Part 231 Securities.

                AMENDMENT OF THE CODE OF FEDERAL REGULATIONS
      For the reasons set out in the preamble, Title 17 Chapter II
of the Code of Federal Regulations is amended as set forth below:
PART 231 -           INTERPRETATIVE RELEASES RELATING TO THE
                     SECURITIES ACT OF 1933 AND GENERAL RULES AND
                     REGULATIONS THEREUNDER
      Part 231 is amended by adding Release No. 33-7190 and the
release date of June 27, 1995 to the list of interpretive
releases.


By the Commission,


                         Jonathan G. Katz
                         Secretary


-------- FOOTNOTES --------

-[23]-     The Commission  has established the  Advisory Committee
           on the Capital Formation and Regulatory Processes (the
           "Advisory Committee"), chaired by Commissioner Steven
           M.H.  Wallman.  The Advisory Committee  is considering
           fundamental issues relating to the regulatory framework
           governing  the  capital  formation  process,  including
           whether the  current system  of registering  securities
           offerings  should  be  replaced  with  a  company
           registration  system.  The  recommendations  of  the
           Advisory  Committee may  result  in  rule proposals  or
           legislative  recommendations that,  if endorsed  by the
           Commission,  ultimately  may  address  the  matters
           discussed in this release.  Under some of the  company
           registration  models being  considered by  the Advisory
           Committee, the need to  draw legal distinctions between
           securities  issued by  registered  companies in  public
           offerings conducted domestically  and offshore would be
           significantly  reduced.  All  securities  issued  by
           companies  registered  with  the  Commission  would  be
           freely  tradable  in  this country,  regardless  of the
           public or private,  or domestic or offshore,  nature of
           that offering.